# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 1:15-23-RGA |
| ) | |
| DAVID R. GIBSON, ) | |
| ROBERT V.A. HARRA, ) | |
| WILLIAM NORTH, and ) | |
| KEVYN RAKOWSKI, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT ROBERT V.A. HARRA JR.'S
## MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Robert V.A. Harra Jr. ("Mr. Harra"), through undersigned counsel, hereby respectfully moves this Honorable Court to enter a judgment acquitting him of all charges pursuant to Federal Rule of Criminal Procedure 29.

The Third Superseding Indictment ("the Indictment") charges Mr. Harra with one count of conspiring to commit securities fraud and false statement violations from October 2009 through November 2010 in connection with the reporting of the dollar amount of Wilmington Trust Company's ("the Bank") loans that were past due 90 days or more; one count of securities fraud; and multiple counts charging false statements. Essentially, the Government sought to establish at trial that the Bank's longstanding and widely known practice of not reporting matured loans that were current for interest and in the process of renewal or extension suddenly became a crime in October 2009. The Government called twenty-two witnesses (including three Special Agents, an expert, and a variety of former Bank employees), and thousands of pages of documents.

1

The evidence introduced during the Government's case proves beyond peradventure:

- The Bank, collectively, and Mr. Harra, individually, did not consider a commercial real estate loan that had matured, was current for interest and pending extension as "past due."

- The Bank's practicing of "waiving" commercial real estate loans that had matured, were current for interest and pending extension from its internal and external past due reports began no less than a decade before the alleged Conspiracy period.

- The Bank, collectively, and Mr. Harra, individually, made no effort whatsoever to conceal the existence of the waiver practice internally, and in fact the routine process of collecting and disseminating information that was used to determine which matured CRE loans would be waived typically involved up to 100 people, more or less.

- The Bank provided documents that explicitly described the waiver practice to both the Federal Reserve and KPMG (the Bank's external auditors) during the period of the alleged conspiracy.

- Neither the Federal Reserve nor KPMG criticized the waiver practice in any way prior to beginning of litigation concerning the matter.

And the Government failed to produce *any* evidence whatsoever that shows that:

- Mr. Harra agreed with any of the other Defendants, or with any other individual, to engage in any conduct that he understood, knew or even suspected to be unlawful.

- Mr. Harra agreed with any of the other Defendants to change the Bank's practices during the period of the alleged conspiracy in any way that could be reasonably said to be in furtherance of an alleged objective of the conspiracy.

- Mr. Harra considered the Bank's practice of not reporting loans that were matured, but current for interest and the process of renewal as "past due" to be in unlawful or in any way contrary to any law, regulation, rule or guideline.

- Mr. Harra undertook any action that could reasonably be said to be an effort to conceal the existence of the waiver practice from the Federal Reserve or KPMG

- Mr. Harra had any knowledge or familiarity whatsoever with any of the arguably-applicable Federal Reserve or SEC regulations defining the term "past due"

In light of the foregoing, even viewing the evidence in the light most favorable to the Government, no rational juror could find the Government's proof sufficient to establish Mr. Harra's guilt beyond a reasonable doubt. While Mr. Harra submits that the evidence proffered by the Government on the counts against him is insufficient as to all elements other than those to which he stipulated,[1] this memorandum specifically addresses the Government's failure to proffer sufficient evidence of the conspiracy alleged in Count One of the Indictment, securities fraud as alleged in Count 2, and of the falsity of the statements and *mens rea* required to establish Mr. Harra's guilt on the remaining counts.

## ARGUMENT

### I. Legal Standard

On a motion filed pursuant to Rule 29(a) of Federal Rules of Criminal Procedure following the close of the prosecution's case-in-chief, the Court "must enter a judgment of

---

[1] Mr. Harra specifically reserves the right to challenge the sufficiency of the evidence on any ground, should it become necessary, at the close of the case, post-verdict, or on appeal.

acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *United States v. Tyson*, 653 F.3d 192, 199 (3d Cir. 2011). In ruling on a motion for judgment of acquittal, the Court is required to "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). The Court's inquiry is whether "a reasonable mind could find the defendant guilty beyond a reasonable doubt of every element of the offense." *United States v. Terselich*, 885 F.2d 1094, 1097 (3d Cir. 1989) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "'[W]here the prosecution's failure is clear,'" a judgment of acquittal is warranted. *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

## II.  Count One: Conspiracy:

Count 1 of the Indictment alleges a Conspiracy to Defraud the United States, Commit Securities Fraud and Make False Statements to Regulators, all in violation of 18 U.S.C. § 371. For the purposes of this Motion, and without waiving any objections to any relevant instructions as to this Count, it may be generally said that in order to find Mr. Harra guilty it must find that each of the following elements has been proved beyond a reasonable doubt.

(1) That two or more persons agreed to defraud the United States or to commit an offense against the United States as charged in the indictment;

(2) That Mr. Harra was a party to or member of that agreement;

(3) That Mr. Harra joined the agreement or conspiracy knowing of its objective to defraud the United States or its objective(s) to commit offense(s) against the United

>   States and intending to join together with at least one other alleged conspirator to achieve those objective(s); that is, that Mr. Harra and at least one other alleged conspirator shared a unity of purpose and the intent to achieve common and illegal goals or objective(s) to defraud the United States or to commit offenses against the United States; and
>
> (4) That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objective(s) of the agreement.

*See generally* 3d Cir. Model Crim. Jury Instr. §§ 6.18.371A (Apr. 2015); *United States v. Caraballo–Rodriguez*, 726 F.3d 418, 425 (3d Cir.2013) (en banc); *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). The Conspiracy count, at its heart, charges that that the Defendants agreed to use the waiver practice to falsely report the amount of the Bank's past due loans with intent to conceal the true number of such loans from the Federal Reserve, SEC and investors.

The relevant witnesses testified, that for at least a decade – and perhaps longer – the Bank did not consider matured commercial loans to be past due if the borrower was current in its interest payments and the Bank intended to extend the loan. (3/16/18 Trial Transcript ("Tr.," excerpts attached hereto at Exhibit A) 1987; 3870-71). Consequently, and pursuant to the Bank's long-standing practice, such loans were not considered to be past due internally, or for public reporting purposes. Not a single Government witness testified that Mr. Harra, or any of the Defendants, ever did or said anything that could be reasonably construed to be consistent with an awareness that the Bank's waiver practice or the Bank's internal definition of a "past due" loan was contrary to any applicable law.

5

And not a single Government witness testified that he or she advised Mr. Harra, or any of the Defendants, that the Bank's long-standing waiver practice was somehow unlawful.

Against that background, it is clear that the Government has introduced absolutely no evidence whatsoever that Mr. Harra agreed with any of Defendants to use the waiver practice for anything other than the routine and well-established business purpose that the waiver practice was originally adopted to serve. It is well-settled that in order to be convicted of a conspiracy pursuant to §371 the Government must prove beyond a reasonable doubt that there was an agreement among two or more people to intentionally commit a crime, and that the defendant joined that agreement "with knowledge of specific illegal objective contemplated by the conspiracy." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir.2010). The Third Circuit has held that merely agreeing with another person to engage in business activity cannot serve as the basis for conspiratorial liability unless the first person is aware the second person is possessed of criminal intent. *United States v. Inigo*, 925 F.2d 641, 653 (3d Cir. 1991). Of course, it logically follows that when, as here, there is no evidence that *any* of the alleged co-conspirators engaged in a business practice with the intent to commit any unlawful act there can be no conspiratorial agreement.

Given the failure of the Government's proof, no reasonable jury can find beyond a reasonable doubt that Mr. Harra and any of the Defendants agreed to "defraud the United States or commit an offense against the United States." The Government offered no evidence that Mr. Harra was ever advised of, or was otherwise aware of, how the accounting and regulatory guidance offered by the Government defined past due loans or how matured current for interest loans were to be treated in SEC filings and Call Reports. The evidence adduced on cross-examination of the Government's witnesses established that Mr. Harra was not responsible for

6

the finance or financial reporting areas of the Bank (3/29/18 Tr. 3986) and did not sit on the Disclosure Committee that considered and approved the Bank's SEC filings. (3/28/18 Tr. 3649). There is absolutely no evidence in the record that Mr. Harra was aware that the Bank's longstanding and open practice of not reporting certain matured commercial loans as past due was contrary to an applicable law or regulation. And there absolutely no evidence in the record that any of Mr. Harra's codefendants were similarly aware of any authority suggesting that the waiver practice was unlawful. Consequently, no rational trier of fact could find beyond a reasonable doubt that Mr. Harra joined "the agreement or conspiracy" knowing of its illegal objective to defraud the United States or to commit an offense.

The failure of the Government to introduce *any* evidence that Mr. Harra or any of his co-conspirators were aware that the amount of past due loans reported to the Federal Reserve, SEC and the public was false is fatal to the charged Conspiracy count. Even if one assumes *arguendo* the past due amount as reported by the Bank was inaccurate – a conclusion with which Mr. Harra strongly disagrees – that is not enough. The Government *must* show that Mr. Harra or his codefendants were aware of the inaccuracy, and there is simply no evidence upon which a jury might find the requisite awareness. Without proof of Mr. Harra's awareness that the Bank's reported past due numbers were "false," as the Government would have it, no rational jury can find that Mr. Harra entered into an agreement with anyone to achieve an unlawful objective.

.     The Government has alleged that concealment of the waiver practice from the Bank's outside auditor and regulators was circumstantial evidence of an awareness of its wrongfulness. (3/12/18 Tr. 1099:15-18, 1101:1-2). However, the Government's witnesses have made it clear that that Bank indeed disclosed the existence of the waiver practice to both the Federal Reserve and KPMG during the alleged conspiracy period. James Corkery, the Federal Reserve's

7

Examiner-in-Chief during the Fed's 2009 and 2010 examinations of the Bank, admitted that "the bank provided the Fed with notice in writing of its waiver practice" in connection with the "last 2009, early 2010 target exam." (3/22/18 Tr. 2692 – 94, 2825-2826). John Depman, KPMG's lead auditor responsible for his firm's audit of Wilmington Trust, also admitted that his firm received the same documents that were provided to the Fed, which plainly and succinctly described that the Bank did not consider matured loans that were current for interest to be past due. (4/9/18 Tr. 5537). Mr. Depman also acknowledged that KPMG was copied on an email that explicitly described "adjustments due to the waived loans in the delinquency section of the report," which when read in the context of that attached documents showed a drop in the amount of delinquent loans for the relevant quarter from more than $300 million to $15.5 million. (4/9/18 Tr. 5580-81). The Government's witnesses, in particular Messrs. Corkery, Fomunyam and Depman, also admitted that the Bank provided them with ample information from which it could be easily deduced that there was a significant difference between the amount of matured loans on the Bank's books and the reported amount of "past due" loans. (3/22/18 Tr. 2663–70, 2675–78, 2822–24; 3/26/18 Tr. 3125–35; 3/27/18 Tr. 3235–36, 3247; 4/9/18 Tr. 5412–14, 5453–56, 5520–22, 5559–61).

Of course, what the Federal Reserve and KPMG knew or should have known about the Bank's method of defining past due loans is the not the ultimate point. Rather, the fact that the Bank clearly told those outside regulators and auditors that it did not consider matured loans that were current for interest and in the process of extension to be past due, coupled with the loan information provided by the Bank that clearly evidenced this practice, is fatal to the argument that Mr. Harra or the other Defendants intended to conceal the waiver practice. This powerful evidence of a lack of intent to conceal, when coupled with a complete absence of direct evidence

that Mr. Harra and the other Defendants were actually aware of the alleged falsity of the Bank's publicly-reported past due numbers means that no reasonable jury can find beyond a reasonable doubt that that Mr. Harra and the Defendants were aware that the Bank's reported past due loan figures were false (if one assumes that they were, which we certainly do not). And a failure of proof as to knowledge of falsity equates to a failure of proof as to an agreement to achieve an illegal objective.

Not only did the Government prove that the waiver practice existed for many years prior to the alleged beginning of the conspiracy, but it also proved that the beginning of the alleged conspiracy period the Bank began the process of eliminating the waiver practice, and ultimately did so. (3/29/18 Tr. 3975–76; 4/4/18 Tr. 4893–94). Obviously, the Bank's decision to end that waiver practice at the beginning of the alleged conspiracy period is logically inconsistent with the Government's assertion that the waiver practice was the means by which the alleged conspiratorial objectives were achieved. So, the Government has argued the temporary extensions of late 2009 and early 2010 were also part of the conspiracy. During its opening statement, the Government claimed that the evidence would show that the 2009 temporary extension process was part of a "new scheme…to hide their past due loans" that the Defendants "came up with." (3/12/18 Tr. at 1101:4-15). But the trial testimony of the Government's own witnesses showed that the temporary extension process not a new one Terry Brewer and Joe Terranova both testified that the temporary extension process had been used in 2006 to help the Bank's relationship managers "catch up" with their matured loans. (4/3/18 Tr. at 4565:17-20, 4/5/18 Tr. 5201-04). Terry Brewer also testified that the 2009 temporary extensions were his idea, and proceeded according to a plan of his own design. (4/4/18 Tr. 4903). Mr. Brewer, the

9

Government's witness, also emphatically rejected the idea that the 2009 temporary extensions were part of a "plot" to "hide matured loans." (4/5/18 Tr. 5195-96).

In light of this failure of proof, the Government is left to argue that the waiver practice, which began long *before* the period of the alleged conspiracy and was ended *during* the conspiracy, was the "manner and means" by which the conspiracy achieved its alleged purposes. Putting aside for the moment the fundamental illogic of that argument, we also note that there is absolutely no evidence in the record that suggests that Mr. Harra either directed or was responsible for the beginning of the waiver practice or its ultimate demise. Simply being present while events occur is insufficient to establish conspiratorial liability. *Cf. United States v. Davis*, 863 F.3d 894, 904 (D.C. Cir. 2017); *United States v. Boria*, 592 F.3d at 481-482. That is especially so when, as here, there is simply no evidence to show that either Mr. Harra or his alleged coconspirators intended that those events constitute a crime.

Should the Government attempt to argue that the various misdeeds of Mr. Terranova are somehow circumstantial evidence of the existence of an agreement to achieve an illegal objective, it is clear that the trial record requires a rejection of such an argument by any rational jury. For his part, Mr. Terranova *never* testified that any of his misdeeds were done with the agreement of Mr. Harra or any of the Defendants. To the contrary, Mr. Terranova admitted that repeatedly took steps to hide his improper conduct from the Bank's management. (4/3/18 Tr. 4461, 4462, 4591, 4594). Mr. Terranova also admitted that his concealed malfeasance, once revealed, led to his termination by the Bank. (4/3/18 Tr. 4698). Given all of this, no rational jury could conclude that Mr. Terranova was part of a conspiracy with Mr. Harra. Indeed, prior to Mr. Terranova's testimony, the Court observed "that there has not really been too much evidence…about Mr. Bailey and Mr. Terranova being part of a conspiracy." (4/2/18 Tr. at 4311–13) In response, the

Government agreed with the Court's characterization that Mr. Bailey was "the glue" that would bind the conspiracy together. (4/2/18 Tr. at 4313). The Government also represented that Mr. Bailey would do what Mr. Terranova ultimately did not – which was connect Mr. Harra to Mr. Terranova's misconduct. Of course, Mr. Bailey did not testify at all, and so there is nothing to tie Mr. Terranova's malfeasance to Mr. Harra, or to any of the other Defendants. Similarly, should the Government argue that any of the relationship managers were dishonest when they reported that their loans were "in the process of extension," the evidence introduced at trial is that, for good or ill, the Bank's managers believed those representations.

In sum, no reasonable jury can find beyond a reasonable doubt that two or more people agreed to commit an unlawful act or acts, and that Mr. Harra joined this agreement with knowledge of the illegal purpose. There is simply no evidence upon which a jury could make such a finding. This Court is thus bound to enter a Judgement of Acquittal on Count 1 (Conspiracy).

### III. Count 2: Securities Fraud

In order to find guilt on this Count, the Government must prove each of the following elements beyond a reasonable doubt:

(1) That Mr. Harra executed or attempted to execute a scheme or artifice

    (a) To defraud persons in connection with the securities of Wilmington Trust Corporation; or

    (b) To obtain, by means of materially false and fraudulent pretenses, representations, and promises, or by statements containing material omissions, money and property in connection with the purchase and sale of the securities of Wilmington Trust Corporation;

  (2)  That Mr. Harra acted knowingly and willfully, and

  (3)  That Wilmington Trust Corporation is an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934 or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

18 U.S.C. 1348.

  The Third Circuit does not have a model instruction for the statute. Because the statute was based on the wire and mail fraud sections, however, other courts have looked to instructions on these offenses for guidance. *See United States v. Coscia*, 866 F.3d 782, 799 (7th Cir. 2017). As is the case with Count 1, the record is devoid of any evidence that Mr. Harra ever acted willfully, that is, that he knew his conduct was unlawful or he intended to do something the law forbids. *3d Cir. Model Crim. Jury Instr.* 5.05 (Apr. 2015); *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009). Second, the Government introduced no evidence that Mr. Harra participated in any scheme to defraud investors. Nor did the prosecution introduce any evidence establishing that Mr. Harra acted to obtain money or property through the making of false or fraudulent statements. While the Indictment does not set forth the false statements upon which the Government is relying, the Bill of Particulars makes clear that the Government is again relying primarily on the alleged falsity of the loans past due 90 day or more set forth in the 2009 SEC Form 10-K submitted by Wilmington Trust. While other false statements are alleged, they are either too vaguely stated to provide a basis for criminal liability or their falsity was not the subject of evidence sufficient to allow the jury to determine their falsity.

  For the reasons previously stated with respect to Count 1, the Bank's representation as to the quantity of loans that were past due 90 days or more provides no basis for criminal liability. And there is no evidence whatsoever that Mr. Harra had any knowledge at al that his conduct, as

manifested by the Bank's long-standing definition of "past due" and the waiver practice, was unlawful. Consequently, no rational jury could find that the Government can prove the requisite elements beyond a reasonable doubt. This Court must therefore grant a judgement of acquittal as to this Count.

IV. **Counts Three - Sixteen: False Statements**

Proof of each of the false statement charges alleged requires, *inter alia*, that the Government introduce evidence sufficient to prove beyond a reasonable doubt that the statement in question was actually false, and that Mr. Harra made the false statement knowingly and willfully. *See United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013); *United States v. Moyer*, 674 F.3d 192, 213 (3d Cir. 2012). However, as previously discussed, the Government has failed to introduce evidence that would permit a rational trier of fact to find that either of those elements has been proved beyond a reasonable doubt. The Government's witnesses provided a multiplicity of conflicting definitions of the term "past due." Martin Infanti testified that a past due loan was one where "either a principal or interest payments that were due had not been made," while acknowledging that exceptions can exist for administrative issues. (3/13/18 Tr. 1411:1-4; 3/14/18 Tr. 1717:1-8). Tosha Styles testified that mature, interest current loans, in the process of extension, were not past due (3/16/18 Tr. 1959:8-14). Stephen Cummings testified that "if a loan was, was matured but current for payment, it could be waived [from the past due loan report] if I got some type of feedback back from the [relationship manager] that it was being worked on" but that "matured loans are shown as past due on Officer Portfolio regardless of whether the interest is current or not" (3/16/18 Tr. 2051:6-8; 2073:9-13). David Fomunyam ("[m]atured loans should be reported as past due.") (3/26/18 Tr. 3079: 12). Because of various and conflicting definitions of "past due" that were introduced during the Government's case, and

13

given that pursuant to some of them the Bank's waiver practice was not unlawful, no reasonable jury could find beyond a reasonable doubt that Mr. Harra willfully and knowingly made a false statement. A judgment of acquittal is thus required. *United States v. Stacks*, 821 F.3d 1038, 1044 (8th Cir. 2016).

Even if one assumes *arguendo* that the Bank's reported past due loan amounts were false (an assumption that Mr. Harra emphatically does not share), as discussed above there is absolutely no evidence in the record from which a rational trier fact could conclude that Mr. Harra knew that the Bank's reported past due amounts were false. The is no evidence whatsoever that Mr. Harra was aware of any arguably-applicable statute, regulation or guideline that defined the term "past due," and there is no evidence that anyone ever discussed with him or in any way implied that the Bank's practices did not comport with any such standard. In fact, the only evidence in the record that discussed the Bank's waiver practice in light of the applicable definitions came from Mico Slijepcevic, who testified that he was "comfortable" with the practice from an accounting perspective. (3/28/18 Trial Tr. 3730-3732). The absence of evidence on this point alone is fatal to the Government's case, and this Court is thus required to grant a judgement of acquittal as to Counts 3-16.

## CONCLUSION

In light of the foregoing, it is respectfully requested that this Court enter a judgment of acquittal on all indicted charges.

| | |
|---|---|
| Dated:  April 13, 2018 | **McCARTER & ENGLISH, LLP** |
| | */s/ Michael P. Kelly* |
| | Michael P. Kelly (#2295) |
| Andrew M. Lawler, Esq. | Steven P. Wood (#2309) |
| Sharon Feldman, Esq. | Dawn Kurtz Crompton (#5579) |
| ANDREW M. LAWLER, P.C. | Renaissance Centre |
| 641 Lexington Avenue | 405 N. King Street, 8th Floor |
| New York, NY 10022 | Wilmington, DE 19801 |
| (212) 832-3160 | (302) 984-6300 |
| *alawler@amlpc.com* | *mkelly@mccarter.com* |
| *sfeldman@amlpc.com* | *swood@mccarter.com* |
| | *dcrompton@mccarter.com* |

Geoffrey N. Rosamond, Esq.
McCARTER & ENGLISH, LLP

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 639-8461
*grosamond@mccarter.com*

Attorneys for Robert V.A. Harra, Jr.