## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**UNITED STATES OF AMERICA**,

v.

                      Criminal Action No. 15-23-RGA

**DAVID GIBSON,**
**ROBERT V.A. HARRA,**
**WILLIAM B. NORTH**, and
**KEVYN N. RAKOWSKI**
      Defendants.

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' RULE 29 MOTIONS

## I.      STANDARD OF REVIEW

     After the government rests its case, a defendant may move for "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In ruling on the motion, the court must "review the record in the light most favorable to the prosecution to determine whether <u>any rational trier of fact</u> could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations and quotations omitted) (emphasis added). A finding of insufficiency is only for cases where "the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002). Therefore, the "burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014).

     In performing a Rule 29 analysis, the Third Circuit has instructed district courts to be "ever vigilant" not to "usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Brodie*, 403 F.3d at 133. This is because "we trust jurors to judge the evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*). Thus, a district court goes too far by deciding contested issues of fact, or requiring the government's evidence to

"foreclose every possibly innocent explanation" for a defendant's conduct.[1] *Brodie*, 403 F.3d at 133; *United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992); *United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial court usurped jury function by deciding contested issues of fact), *cert. denied,* 457 U.S. 1106 (1982); *see also* 2A Charles A. Wright, Fed. Prac. & Pro. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").    The fact that a defendant may point to evidence that "also permits a less sinister conclusion is immaterial." *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998).

## II.    <u>TRIAL EVIDENCE – COMMON TO ALL CHARGES</u>[2]

### A.    <u>THE BANK'S REPORTING OBLIGATIONS</u>

As a financial institution, the Bank was subject to regulatory supervision by the Board of the Governors of the Federal Reserve System ("Board of Governors") and the Federal Reserve Bank of Philadelphia ("Reserve Bank") (collectively referred to as the "Federal Reserve").  The Bank was a "State Member Bank" of the Federal Reserve System, as defined by Title 12, United States Code, Section 1813(d).  (Tr. 2298-99 (Corkery).)  The Board of Governors of the Federal Reserve System (the "Board of Governors") was the primary federal banking agency charged with supervising and regulating the Bank to ensure that the Bank engaged in safe and sound banking practices and complied with federal banking laws.  (*Id.*)  The Reserve Bank carried out the day-

---

[1] It is also important to note that, if the court grants a Rule 29 motion before the jury has rendered its verdict, the government cannot appeal that decision.  *United States v. Napolitan*, 762 F.3d 297, 313 n.1 (3d Cir. 2014).

[2] This section ties the trial evidence to the allegations in the Third Superseding Indictment (the "Indictment") (D.I. 243).

to-day supervisory functions of the Board of Governors with respect to WL and WTC, under authority delegated to it by the Board of Governors.  (*Id.*)

The Bank was required to file, and did file with the Board of Governors and the Reserve Bank, a quarterly "Consolidated Report of Condition and Income for a Bank with Domestic Offices Only – FFIEC 041," which is commonly known as a "Call Report."  (Tr. 2968-75 (Oliver); GX 86A-B.)  Each Call Report set forth detailed financial data about the Bank's financial position and the results of its operations for that quarter.  Schedule RC-N of the Call Report required disclosure of the Bank's total amount of loans for that quarter that were (a) 30 to 89 days past due, (b) 90 days or more past due, and (c) on nonaccrual status.  (Tr. 2975-80 (Oliver); GX 86A.)

The Bank was also required to submit to periodic safety and soundness examinations by the Federal Reserve and other state and federal financial regulators.  (Tr. 2298-99 (Corkery).)  The Bank provided its total amount of past due loans to the Federal Reserve in advance of these examinations, which the Federal Reserve considered in its conclusions regarding the Bank's safety and soundness.  (Tr. 2374 (Corkery); 3016-17 (Fomunyam); GX 213.)

As a result of the Federal Reserve's 2009 full-scope examination, the Bank entered into an Memorandum of Understanding ("MOU") with the Federal Reserve in October 2009 that, among other obligations, required the Bank to submit its past due loan information to the Federal Regulators on a monthly basis (the "Monthly Regulatory Reports").  (Tr. 2381-82 (Corkery); GX 283.)

As a publicly-traded company that was listed on the NYSE, the Bank was also required to file quarterly and annual reports with the United States Securities and Exchange Commission ("SEC").  A quarterly report is referred to as a "Form 10-Q," while an annual report is referred to as a "Form 10-K" (collectively, "SEC Reports").  (Tr. 1319-21 (Walker).)  The Bank was required to disclose accurately in its SEC Reports the Bank's total amount of loans that were past due for 90 days or more and still accruing interest, as well as its total amount of loans on nonaccrual status.

(Tr. 1327-28, 1331-34 (Walker); GX 12.)  Both disclosures are important metrics, among others, for investors to analyze the quality of the Bank's loan portfolio [and the bank's health generally]. (GX S-6; Tr. 5724-25, 5734 (Hodgson).)

>   B.      THE BANK FAILED TO REPORT MILLIONS OF DOLLARS OF PAST DUE
>           LOANS ON ITS BOOKS FROM REGULATORS AND THE PUBLIC

A "matured loan" is a term loan in which the principal payment is past due.  (*See, e.g.,* Tr. 1410 (Infanti).)  Repayment in full is due upon maturity of a loan unless the Bank extends the loan through a new legal agreement with the borrower.  (Tr. 1844-1846 (Styles).) Although the Bank's computerized internal accounting system (known as "SHAW") considered all matured loans to be past due (Tr. 1290 (Beckner); 4076-77 (Marley); 5216 (Brewer); 5319-25 (Depman).), the Bank had a practice of waiving, that is, failing to report in SEC Reports and Call Reports, matured loans that were internally designated as "current for interest" and in the "process of extension."  (Tr. 1851, 1853, 1867-71 (Styles); 1515-18 (Infanti); 2051-54 (Cummings).)

HARRA, GIBSON, NORTH, and RAKOWSKI were each aware of the Bank's waiver practice and knew that the Bank failed to report publicly certain types of matured loans.  (Tr. 1556-67, GX 418; Tr. 3450-55, 476-476A; Tr. 6063-69, GX 524; Tr. 3442-49, GX 527.)

NORTH, as Chief Credit Officer, was responsible, among other things, for the Bank's internal list of past due loans (the "Delinquency Report").  (Tr. 2056-57; Tr. 2074; GX448 (Cummings.)  The Delinquency Report was used by the Bank as an essential step in its reporting of past due loans to the SEC and the Federal Reserve.  (Tr. 1853; 1867-1871 (Styles); Tr. 4211-4216 (Hart).).  The Delinquency Report was populated with all the past due loan information from the Bank's SHAW system.  (Tr. 1851 (Styles)).  NORTH approved the waiver of matured loans from the Delinquency Report, which was then sorted into two primary subreports: a "Balance Sheet" subreport, which calculated past due loan information in a format to be reported in public filings with the SEC, and an "FRB" subreport, which calculated the information in a format to be

reported (as to the "Bank 1" loans) in Schedule RC-N of the Call Report.  (Tr. 1921-24 (Styles); 2056-59 (Cummings); GX 446, 448.)  Both subreports were filtered in such a way that loans which had been deemed waived from the Delinquency Report were not included in the total amount of loans considered to be past due for financial reporting purposes.  (Tr. 1853; 1867-1871 (Styles); Tr. 4211-4216 (Hart).)

Defendants Harra, Gibson, North, and Rakowski were aware that the approved Delinquency Reports were forwarded to the Bank's Office of the Controller and used to create the Bank's final report of Past Due and Nonperforming Loans ("Past Due Report"), and that the loan figures contained in the Past Due Report, which did not include waived loans, were reported in the Bank's Call Reports and SEC Reports, and in the Monthly Regulatory Reports to the Federal Regulators.  (Tr. 1837-38 (Styles); Tr. 2836-37, 2839-41 (Strohmeier).)

Defendant North expressed concern repeatedly over the rising magnitude of matured loans at the Bank, the possibility that the waiver practice could be subject to scrutiny by outside parties, and the practice of waiving loans that had not been approved for extensions from past due reporting.  Yet, NORTH approved the waiver of loans from the Delinquency Report on a continual basis even when he knew a substantial portion were of poor quality and/or had been on the Delinquency Report for multiple reporting periods.  Examples include the following:

- GX 478 (March 7, 2007): Email from Defendant North to others:  "The number of waived/matured loans has been too high over the last 4 quarters, and in order to avoid that **becoming an 'issue' with examiners, audit, or exec management** I'd like to think that we can help ourselves by getting this under control."

- GX 549 (November 6, 2008):  Email from Defendant North to others:  "The first section deals with Matured loans where interest is current.  This totals almost $116MM.  While this is an off quarter end month, the concern is that such a **level of matured facilities could be viewed as a serious administrative weakness**.  At many banks, you can't advance under a matured facility.  If we move in that direction we'd have major issues based on how we've handling these historically…In these trying times, it gives me concern that we have a greater portion of our clients that may have some serious problems."

- GX 487 (June 20, 2008): Email from Defendant North to others: "Wayne's list still shows over $68MM in past due loans. In addition there are another 100+/- in matured (int current) loans that need to be addressed. On the latter, if we've completed our approval process on these. But the documentation has not gotten processed, I'm OK waiving. **All other 'I'm working on it' situations are not ones that we should be waiving.** As always, your help in addressing all of these situations is greatly appreciated and extremely important as **we report out our second quarter numbers**."

- GX 417: 1/6/2009: Email from Wayne Irwin to Defendant North: "The original concept of waiving loans is no longer an issue. The original process of waving loans started due to the non payment between WT and WT PA and WT FSB (participation loans)…The new participation process should have fixed that problem. **Now we have the task of taking away the crutch (waving loans) for the matured loans**."

- GX 446: 1/16/2009: Email from Steve Cummings to Defendant North: "I had thought for the last few quarters that we **were trying to only waive bank errors or loans that had made it through the approval process but were not booked in time to come off delinquency. Apparently that has not exactly been reality…**With your input, we would like to set a reasonable goal/game plan for getting these loans renewed/extended and allowing the system to report a true past due number without a lot of adjustments that could raise issues for us in the future."

- GX 489: 6/11/2009: Email from Rich Conway to Defendant North: "I asked Steve to printout (attached) a list of all the matured/maturing loans as of 6/30/09. It total 507 loans for $708,793.532. Over time, some will renew/extend/payoff in the normal course of business. However, you and I both know that some constant universe of these loans will remain – the names may change, the amounts may change, but it will always be out there. In a perfect world, we would all love for the number and balance to be zero and the RMs and LAs would diligently begin to monitor Officer Portfolio out 120 days prior to maturity. **However, the reality today is the number is overwhelming given the time, resources and existing process for renewal.** The answer is today is not "Well, we just need to get it done!"

Defendant Rakowski, the Bank's Controller, was proficient in GAAP and regulatory accounting, wrote quarterly memoranda to the Bank's Audit Committee regarding the impact of accounting pronouncements on the Bank's public reporting. (Tr. 3677-3678 (Slijepcevic); Tr. 5405-5408, 5439-5441 (Depman); GX 740, 741R.) As Controller, Defendant Rakowski was responsible, among other things, for approving the Bank's Past Due Report. (Tr. 3677, 3679

(Slijepcevic).)  Like defendant North, defendant Rakowski knew that the loan figures contained in the Past Due Report, which did not include waived loans, were reported in the Bank's Call Reports and SEC Reports, and in the Monthly Regulatory Reports to the Federal Regulators.    (Tr. 6063-69 (Lo Piccolo), GX 524; Tr. 3675-79, 3697-99, 3708-11 (Slijepcevic).)  Rakowski approved the past due loan amounts in the Past Due Report for public reporting regardless of the underlying basis for the waiver decisions or the length of time by which particular loans had exceeded their contractual terms.  (Tr. 3437-39 (Oliver), GX 574-574A.)

Defendant Gibson participated in the Bank's drafting of SEC Reports with respect to both qualitative and quantitative disclosures, including the Bank's quantity of past due loans. (Tr. 3675-79, 3683-88, 3693 (Slijepcevic).)  In his role as CFO, Gibson signed a hard copy of the Bank's quarterly Call Reports before they were submitted electronically to the Federal Reserve.  (GX 76, 77, 78, 79.) He also electronically signed the Bank's SEC Reports and Call Reports for the Third and Fourth Quarters of 2009 and the First and Second Quarters of 2010.  (GX 4; GX 1; GX 5.) Gibson further signed a certification pursuant to 18 U.S.C. § 1350 for each reporting period stating that the information contained in each of the reports "fairly present[ed], in all material respects, the financial condition and results of operation of Wilmington Trust."  (*Id.*)

Defendant received and reviewed the Bank's Past Due Reports and was aware that the Bank reported its past due loan information publicly in its SEC Reports, Call Reports, and in the Monthly Regulatory Reports pursuant to the MOU.  (GX4 (10Q-3Q-09); GX 5 (10Q-1Q-10); GX 76 (CR-3Q-09), GX 77 (CR-4Q-09), GX 78 (CR-1Q-10.)  Like Gibson, Harra also signed a hard copy of the Bank's quarterly Call Reports.  (GX 76, 77, 78, 79.)  Harra also signed the Bank's 2009 Form 10-K in his capacities as President/COO and as a member of the Board of Directors. (GX 1, p. 184.)  Along with Gibson and another Bank employee, Harra also electronically signed a page within the annual report certifying that the Bank's internal controls over financial reporting were effective.  (GX-1, p. 175.)  Harra further participated in earnings calls following the release

of the Bank's financial information during the time-period set forth in the Indictment.  In addition,

Harra was a primary point of contact with the Bank's examiners at the Federal Reserve.  (Tr. 2447,

2456, 2805 (Corkery).)

### C.    MATURED LOANS INCREASE SIGNIFICANTLY IN 2009

Although the Waiver Practice existed at the Bank as far back as 1999, the Bank waived a

relatively small amount of past due loans prior to 2009.  For example, in 1999, the Bank only

waived one 90-day past due loan totaling $1.08 million as current for interest and in the process

of extension.  (DX 1296; Tr. 1898-1903 (Styles).)  In June 2006, the Bank only waived nine loans

totaling $2.7 million as current for interest and in the process of extension.  (GX 1499-C; Tr. 4053-

4055.)

But by 2009, the Bank experienced a rising volume of matured loans that coincided with a

downturn in the economy.  (Tr. at 1436-38 (Infanti); Tr. 3891-3892 (Conway).)  A large number

of commercial real estate ("CRE") borrowers were unable to repay outstanding principal amounts

upon maturity.  (Tr. 3891-3892 (Conway).)  The Bank utilized supplemental financing practices

to provide real estate developers with additional financing, which allowed borrowers to make

interest payments.  (Tr. 1523-1524, 1531-1537 (Infanti); Tr. 4072-4074 (Marley); GX 1031(C)

(listing of $103.5 million in self-paid and cross-paid waived loans for 3Q09 and 4Q09); Tr. 4236-

4239 (Hart)); Tr. 4884-4885 (Brewer).)

The defendants were aware of the Bank's supplemental lending practices.  During its 2008

audit, KPMG identified the use of the practice and informed the defendants that "capitalized

interest is not good and anytime a second extension is made should be an immediate red flag."  GX

536 (email from Gibson including each of the defendants).  As a result, the Bank amended its

commercial real estate lending policy in April 2009   (GX 370/370A (noting that working capital

lines of credit "are now an exception to policy"); GX 579 (email exchange between defendants

North and Harra, with Harra referring to KPMG as the "Grand Inquisitors" and North responding

that "Relative to interest reserves, the issue as we all know relates to the providing of subsequent financing to provide additional interest reserve on an existing project").)

The Federal Reserve also identified, and was highly-critical of the practice, during its 2009 full scope examination.  Asset Quality Examiner David Fomunyam repeatedly addressed the issue in loan discussion meetings in 2009 and 2010.   (Tr. 3049-3051, 3080-3081, 3101-3102 (Fomunyam).)   And the Federal Reserve's 2009 Examination Report explicitly noted that "an inordinate number of loans have interest reserves and/or working capital lines of credit that may be masking the severity of problem loans within the portfolio."  (GX 221R at 4-(8).)   Examiners discussed issues identified with supplemental lending practices with defendants Harra, Gibson, and North.   (Tr. 2334-2335, 2344 (Corkery); 3099-3103 (Fomunyam).)   Ms. Rakowski also maintained a document from the Federal Reserve in her desk files listing the Federal Reserve's critical findings from the 2009 examination, including in relation to supplemental financing.  (GX 463-R; Tr. 6057-6061 (Lo Piccolo).)

Based upon its internal accounting system and policies, to renew these matured loans properly, *see supra*, the Bank would have needed to employ a full underwriting process on a global, relationship-wide basis to determine the borrowers' qualifications for extensions and their capacity to make timely payments.  (Tr. 1437-1438 (Infanti) (noting that the "underwriting that would support the extension should probably be more robust that it was when we approved the loan … [because] [t]he assumptions that we made two or three years ago clearly did not work"); Tr. 4855 (Brewer) (stating that for a loan extension the underwriting is "the same as what I described …earlier in the conversation, where you are evaluating the request at that point in time, you're evaluating the capacity of the financial condition of either the borrower, the sponsor at that point in time, and you are evaluating the market conditions at that point in time").)   In addition, the Bank was required to enter into new loan agreements, or to extend loans using executed change-in-terms agreements, with its borrowers to revise the loan maturity dates in the internal accounting

system.  (Tr. 1283-1284 (Beckner); GX 372 at Section 6.6.7 (setting forth the Credit Review Management's Section evaluation of new loans or modifications to existing loans booked on the SHAW system); Tr. 1445-1448 (Infanti).)

The significant decrease in real estate valuations and changes to Bank lending policies, however, made it difficult for the Bank to extend or restructure many lending relationships in 2009 without suffering negative economic consequences, including but not limited to, placing loans on nonaccrual status, taking additional reserves against loan losses, and/or charging off losses relating to particular loans.  (Tr. 1455 (Infanti) (stating that in 2009 "we were unfortunately seeing deteriort[ing] situations, so the risk ratings were getting more adverse); *id.* at 1456-1462 (testifying that issues relating to declining metrics in the portfolio were shared with each of the defendants, either in direct conversations, or during meetings/pre-meetings relating to quarterly credit quality meetings); GX 937A (3Q09 Housing Report listing declining credit metrics); Tr. 3324-3330 (Stuart); GX 405 (noting the decline in Delaware CRE appraised values in April 2009 and referring to the "catastrophic consequences" of obtaining updated appraisals.)  As a result, the Bank's volume of waived loans increased significantly, and the difference between the loans that were actually past due and those that were reported as past due by the Bank grew steadily.  (*See, e.g.,* GX 1010, 1010A, 1010B (Hart demonstrative charts); Tr. 4216-4226 (Hart testimony relating to past due charts).)

Accordingly, the Bank failed to report approximately $41.6 million in relevant commercial loans that were 90 days or more past due at the end of the First Quarter 2009 (compared to only $10.3 million in commercial loans actually reported on its First Quarter 2009 Form 10-Q); approximately $173.1 million in relevant commercial loans that were 90 days or more past due at the end of the Second Quarter 2009 (compared to only $10.9 million in commercial loans actually reported in its Second Quarter 2009 Form 10-Q); and approximately $297.7 million in relevant commercial loans that were 90 days or more past due at the end of the Third Quarter 2009

(compared to $17.4 million in commercial loans actually reported in its Third Quarter 2009 Form 10-Q.  (*Id.*)  Of the relevant waived loans in the Third Quarter 2009, approximately $139.3 million were 180 days or more past due, and approximately $83.1 million were 270 days or more past due.  (GX 1008; Tr. 4222-4223 (Hart).)  Thus, the relevant waived loans that were over nine months past due was over 4.5 times higher than the actual number of commercial loans reported as past the Bank's 3Q 2009 Form 10-Q.

> D.  <u>FEDERAL EXAMINATION LEADS TO MEMORANDUM OF UNDERSTANDING AND FURTHER MISREPORTING OF PAST DUE LOANS</u>

In or around September 2009, the Federal Reserve concluded its full-scope examination of the Bank, finding that the Bank's condition was "less than satisfactory" for a number of reasons, including that the Bank's "use of working capital lines of credit and interest reserves was prevalent in many of the relationships reviewed" and that "there was a tendency to extend multiple working capital loans/lines of credit and interest reserves to the same borrower"  (GX 221R at 2-(1), 2-(3), 4-(8)-4(9).)  As a result of the examination process, the Federal Reserve required the Bank to enter into an informal enforcement action known as a Memorandum of Understanding, or MOU, on October 21, 2009.  (Tr. 2381-2382, 2384-2388 (Corkery); GX 283 (the MOU).)  The MOU required the Bank to satisfy a number of conditions, including that the Bank submit its past due loan information to the Federal Reserve on a monthly basis beginning with past due loan figures for September 2009.  (*Id.* ¶ 15(c).)

Due to the terms of the MOU, the Bank's Finance Department, led by Mr. Gibson (the CFO) and Ms. Rakowski (the Controller), began preparing the Past Due Report on a monthly, as opposed to quarterly, basis.  (Tr. 1993 (Styles); Tr. 3727 (Slijepcevic).)  Each of the defendants was aware of the MOU and its specific requirements for the Bank to report past due loans on a monthly basis.  Defendant Harra signed the MOU as a member of the Bank's Board of Directors.  (*Id.* at 8.)  Defendant Gibson was present at the meeting when the Federal Reserve presented the

MOU to the Board of Directors.  (Tr. 2385 (Corkery).)  Defendant North retained a binder of materials relating to the MOU (which included annotations relating to the past due loan requirement) and other Federal Reserve enforcement actions.  (Tr. 5099-5106 (Brewer testimony regarding enforcement binder provided to him by Defendant North that contained a marked-up copy of the MOU).)  And Defendant Rakowski retained in her desk files an email relating to "Waived loans for past due reporting," which set out the monthly requirement for past due loan reporting with a handwritten notation stating "Regulators asked for Past Due in Call Report, that is everything."  (GX 524; Tr. 3723-3724, 3727 (Slijepcevic).)

The Bank forwarded copies of the Past Due Report to the Federal Reserve to comply with the terms of the MOU.  (Tr. 2388-2393 (Corkery).)  The Federal Reserve expected truthful submissions to the MOU so that it could "accurately assess the condition of the organization."  (Tr. 2394 (Corkery).)  The final Delinquency Report for October 2009, however, omitted relevant commercial loans, and thus understated, by approximately $300.1 million, the Bank's quantity of loans that were contractually past due.  (GX 574/574A; GX 1010A; Tr. 4223-4225 (Hart testimony relating to GX 1010B).)  Defendants North, Gibson, and Rakowski each received a copy of the October 2009 Delinquency Report and were aware that waived loans were not included in the past due numbers.  (GX 574, email from Rakowski to Gibson stating, "We did pull the waived loans from the Past Due Report").

On November 25, 2009, the Bank submitted its October 2009 Past Due Report to the Federal Reserve in connection with the MOU.  (hereafter the "October 2009 MRR")  (GX 247 (submissions under the MOU, including the submission dated November 25, 2009).)  The October 2009 MRR included a paragraph setting forth why past loan figures for October ($82.2MM in reported loans 90 days or more past due) were significantly higher than in the month of September ($38.7MM in reported loans 90 days or more past due).  The Bank attached to the letter past due loan information from prior months/quarters as an attempt to justify the "rise in 'past due' balances

for October."  Neither the October 2009 Past Due Report, nor the Past Due Reports from the prior periods, however, included waived loans.

The letter, which the Bank submitted on or about November 25, 2009 – less than ten days following the Gibson/Rakowski email admitted as GX 574 – portrayed the rise in past dues as a "billing and collection issue" that occurred during intra-quarter periods, and which would be corrected through "changes" in those practices in 2010.  The letter did not reference the waiver practice, nor the fact that the October 2009 loan data and the data from the other comparative months understated the total amount of past due loans.  Defendant North retained an edited version of the November 2009 letter in his enforcement binder.  (Tr. 5102-5103 (Brewer); GX 521.)  The edited version marked the entirety of the explanatory paragraph, with additional suggested changes, and the word "o.k." next to the paragraph.  (GX 521.)

E.   THE MASS EXTENSION PROCESS

Five days after he signed the MOU, on or about October 26, 2009, Defendant Harra sent an email entitled "Monthly past due report and 'matured' credits" to the Bank's market managers, copying Defendant North.  (GX 492.)   In the email, Defendant Harra stated that "'matured' commitments, renewals, or loans that require extensions need to be worked-on currently, and kept current and up-to-date."  (*Id.*)  He continued the email by stating, "These are critical issues to me and I cannot over-emphasize their importance to the company. Work on the delinquencies monthly! Keep them current! Keep renewal commitments current! I will leave it to each of you to communicate this to your lenders."  (*Id.*)  Defendant Harra previously emphasized the importance of keeping delinquent loans down at the end of the Third Quarter 2009.   In an email dated September 11, 2009, he forwarded a copy of the Bank's August 2009 Past Due Report to Brian Bailey, writing: "Brian, delinquencies are headed in the wrong direction!  Before you head out today, I hope you can fire up the troops to work on this in view of the pending quarter end." (Tr. 6046-6048 (Lo Piccolo); GX 541R.)

Shortly after the Harra email on October 26, 2009, the Bank decided that the practice of waiving matured-but-current-for-interest loans would cease starting on January 1, 2010.  On October 29, 2009, Rich Conway sent an email to all commercial lenders stating that "the usual end-of-the-quarter past due clean up must now be done monthly," and that the practice of waiving loans that were current for interest "will change effective 1/1/10."  (Tr. 3928-3930 (Conway); Ex. 493.)  That same day, Conway sent a calendar invite to Defendant North, Brian Bailey, Joe Terranova, and Steve Cummings to "Discuss process and strategy to eliminate matured loans by 12/31."  (GX 443.)  The purpose of the meeting was to "talk about matured loans and how we can make them go away by 12/31.  This cannot be a quick fix for 90 or 120 days as the problem will just return."  (*Id.*)  Conway testified that he had hoped that the effort would have resulted in matured and maturing loans being extended "a year, two years, or something like that."  (Tr. 3934 (Conway).)  Joe Terranova sent a similar email to his Delaware lenders dated November 9, 2009, outlining similar expectations for loan renewals and noting that "senior management is requiring that all matured loans in the portfolio be acted upon prior to 12/31/09."  (Tr. 4383-4386 (Terranova); GX 626/626A; Tr. 4928-4929 (Brewer) (testifying that the Terranova list of matured/maturing loans included 386 loans totaling $570.1 million.)

The Bank was unable to extend the loans on a long-term basis at year-end 2009.  Instead, the Bank mass-extended, on a short-term basis, hundreds of millions of dollars of commercial loans.  The extensions did not involve the "robust" underwriting that Marty Infanti testified should typically accompany loan extensions during an economic downturn (Tr. 1438 (Infanti).)  Nor did the underwriting follow the guidelines set forth in the Bank's CRE lending policy.  (Ex. 370.)  Instead, Terry Brewer testified that he approved the short-term extensions based on a "superficial review."  (Tr. 4954 (Brewer).)  Short-term extension decisions only involved "touching" the credit and gaining some "basic information."  (Tr. 4932 (Brewer).)  Some extension requests were approved the same day that they were submitted by the Relationship Manager.  (Tr. 5048

(Brewer).)  Although Mr. Brewer wrote in an email that matured loan extensions "was the biggest and most important task that we need to undertake in the Delaware real estate world," he conceded at trial that he did not meaningfully review each credit.  (Tr. 4933-34 (Brewer).)  As he testified relating to the Delaware CRE portfolio:

> There were 580 loans we just looked at. These loans are very complex. The magnitude of my overview of that to get the kind of thing you're driving to for a longer term extension, **couldn't possibly have done**. Could I perhaps pick up something here or there to see? Maybe there was enough done in that analysis.

(Tr. 4933, 4936-4941 (Brewer) (emphasis added); GX 409 (email from Brewer noting that the "vast majority" of loans extended to April 2010 "need to be actively touched (evaluate and negotiated for needed modifications" because "the economy has clearly impacted the vast majority of our development projects and we need to address material weaknesses.")  Mr. Brewer was unable to recall any of the Delaware CRE loans on the list that he did not sign off on at year-end 2009.  (Tr. 4929 (Brewer).)

One of the primary reasons why the Bank was unable to meaningfully underwrite matured loan extensions was because many of the CRE loans lacked updated appraisals.  (GX 574.)  Short-term extensions under the "superficial review" process pushed out the maturity date for the purpose of completing the "full due diligence" to make an actual informed, underwriting decision.  (Tr. 4943 (Brewer).)  Defendant North and other Bank employees thus approved short-term extensions through year-end 2009 for many CRE loans for which the Bank did not have updated appraisals – and where little, if any, underwriting was conducted.  The mass short-term extensions resulted in the maturity dates of some loans being changed on SHAW (i.e., those loans where the lenders obtained signed change-in-terms agreements from borrowers).  But the Bank continued to waive other loans from past due reporting because signed agreements were never obtained from the borrowers.  (GX 55 (December 2009 Delinquency Report).)

The defendants were aware that loans subject to the short-term extension process exhibited problems and that the extensions had not been properly underwritten.  For example, in an email dated December 16, 2009, that referenced the short-term extensions, Defendant North explained to Defendant Harra that "[m]any of these credit turds will simply take some time to make/get better."  (GX 527.)  In light of the economy and number of matured/maturing loans, North stated that "we can't clean it all up in a short time frame" – particularly in the two weeks before year end. (*Id.*)  In a subsequent email to each of the defendants and other bank executives in January 2010, Defendant North described matured loans as a "decades old issue" and stated that the purpose of the short-term extensions was "to allow for the proper/needed level of underwriting" – a concession that the short-term extensions did not meet that standard.  (GX 418.)

In or around January 2010, the Bank developed a process known as the "Surge" to assist Delaware lenders with performing global cash flow analyses of the Bank's largest relationships. Defendants, as well as other senior Bank executives, learned that the "Surge" process revealed that many of the Bank's largest lending relationships, including relationships extended or waived at year-end 2009, had deteriorated significantly.  (Tr. 5038 (Brewer) (testifying that the Surge generally revealed more negative news about projects being renewed, many of which had been granted short term extensions).)  For example, on January 11, 2010, Mr. Brewer sent an email to Defendants North, Gibson, Harra, and other bank executives in which he stated that one of the Bank's largest relationships, Reybold, had $300,000 in negative monthly cash flow; and referred to the Bank's financing of "speculative developments" to the P.J. Bale lending relationship.  (GX 528.)  Despite these concerns, the Reybold relationship was waived throughout 2009 and extended, on a short-term basis, in the First Quarter 2010.  (GX 1030(c).)  Similarly, loans in the Bale relationship were waived throughout 2009, extended on multiple occasions in 2010, and eventually placed on nonaccrual status in the Third Quarter 2010.  (*Id.*)

16

Negative information from the Surge continued to be made available to the defendants through the end of January and into February 2010 and prior to the Bank reporting its year-end financial statements.  Mr. Brewer testified that he would brief Defendants Harra and North on Surge results on a weekly basis.  (Tr. 4970 (Brewer).)  In addition, all of the defendants were recipients of a January 25, 2010 email stating that the Surge produced extremely negative information regarding some of the Bank's largest borrowing relationships and suggesting necessary risk ratings downgrades of $446 million and an increase of $10.5 million to the Bank's allowance for loan and lease losses.  (GX 410.)

The Bank did not communicate the short-term extension process to the Federal Reserve. Rather, the Federal Reserve learned about it during its 2010 examination in the Summer 2010 and criticized the practice as problematic.  As David Fomunyam testified:

> It looked like the extensions were being done without any support for the extensions, and you didn't get a good feel that at the end of that extension, that credit was going to get repaid or the borrower's financial condition was going to get any better.  So you were just delaying the problem, in essence.

(Tr. 3100 (Fomunyam).)  Fomunyam further testified that the practice of temporary extensions had the ability to mask delinquencies "[b]ecause a matured loan [i]s reported as a delinquent loan, but if you do the extension on the credit, you've moved the maturity date . . . so it's not matured any more, so you are really masking delinquencies in that form."  (*Id.*)

Moreover, none of the individual Defendants communicated the Bank's short-term extension process to KPMG audit partner John Depman.  (Tr. 5497-5498 (Depman).)  KPMG tested loan modifications as part of its 2009 audit, but the population only involved loans where there existed a signed change in terms agreement.  (Tr. 5378, 5391 (Depman).)   No exceptions were noted as part of KPMG's test work.  (Tr. 5375-5377, 5391 (Depman).)  KPMG also tested loans that actually appeared on the Bank's Past Due Report for the first three quarters of 2009 "to determine whether the loans were brought current, charged off, or whether the change in status

17

was attributable to a modification of terms." (Tr. 5376 (Depman).) That test did not reveal any exceptions, either. (Tr. 5377 (Depman).) Because the waived loans were not on the Bank's Past Due Report, and because they did not involve a signed CITA, they were not part of KPMG's sample population for loan modifications.

F.   CAPITAL RAISE

In or around December 2009, Gibson and other Bank executives started contemplating raising capital through a public stock offering. (GX 435; Tr. 5799-5802 (Schechter).)

Rakowski learned of the capital raise no later than on or about February 1, 2010. (GX 436; Tr. 5808 (Schechter).) North learned of the capital raise no later than on or about February 5, 2010. (GX 633; GX 633A.)

Each of the defendants participated in the drafting and/or review of the Bank's 2009 Form 10-K. (GX 433; GX 516; GX 558; Tr. 3490-97; 3499-3500; 3504-3510 (Roberts).) Moreover, the jury may infer that each defendant knew that the past due numbers in the Bank's 2009 Form 10-K would be relied upon by investors in deciding whether to purchase stock offered through the capital raise. (GX S-6; Tr. 5812-15 (Schecter).)

On or about February 22, 2010, the Bank filed its 2009 Form 10-K with the SEC. GX 1. The next day, the Bank filed an Offering Prospectus that outlined its plan to issue 18,875,000 shares of common stock at $13.25 per share. (GX 3.) The Prospectus explicitly incorporated the Bank's 2009 Form 10-K SEC filing. (GX 3; Tr. 5841-43 (Schechter).) The Form 10-K reported only $30.6 million in the Bank's 90-days past due number. (GX 1.) The defendants each knew that the Bank's public reporting understated its actual amount of past due loans by a material amount, and each caused the Bank to issue these false statements.

Moreover, the Form 10-K did not disclose that the Bank had mass-extended hundreds of millions in loans by year-end 2009; that the Bank "waived" an additional $330 million of matured loans from public reporting; that the Bank had been required to report past due loan information

on a monthly basis to the Federal Reserve; or that the Bank's "Surge" process had revealed that many Delaware CRE relationships were experiencing significant performance issues.  (GX 1.)

The Bank raised approximately $287 million from the public stock offering.  (GX 3, Tr. 5843 (Schechter).)

G.   NONDISCLOSURE OF CHANGING TREATMENT OF MATURED LOANS

On or about March 24, 2010, North drafted a memorandum to Harra and another Bank executive regarding the Bank's continuing issues with matured loans.   (GX 476A.)   The memorandum was submitted prior to a meeting on or about March 26, 2010, between North, Harra, Gibson, and another Bank executive regarding "Loan Maturities."   (GX 476; GX 585.)   The memorandum suggested that more time was needed in order to underwrite a number of the loans that had either been extended at year-end 2009, or matured during the First Quarter 2010.   (GX. 476; GX 1036B (Hart analysis showing $109 million and $244 million in waived loans that received loan extensions at year-end 2009 and during the First Quarter 2010, respectively.)

In a follow-up email to Harra, North noted that "its [sic] come to pass that some of the [Delaware] RMs never documented the 4/1/10 extensions. What we don't want are the Feds seeing a skew of matured loans on SHAW.  They've never commented on matureds in the past, but I want to give them no opportunity in the future."  Harra replied, "Uggh.  Got it.  No need for further elaboration."  (GX 472.)   Because the matured loans could not be properly extended by the end of the First Quarter 2010, the Bank extended an additional pool of matured loans on the last weekend of March 2010 – a process that North referred to in an email (in which Harra was a recipient) as a "fire drill."  (Tr. 5032-5038 (Brewer); GX 543.)

Neither Harra nor North informed the Federal Reserve about the Waiver Practice, the mass-extension process, or the Bank's pool of matured and maturing loans.  (Tr. 2411-2412; 2315; 2374; 2577-78; 2793-95; 2804 (Corkery); Tr. 3016-17 (Fomunyam).)

In its First Quarter of 2010 Form 10-Q, filed with the SEC on or about May 10, 2010, the Bank reported $24.3 million in Commercial Loans that were past due 90 days or more.  The Form 10-Q disclosed, for the first time, that a portion of the Bank's past due loans were "performing, have matured but have not paid off, and for which underwriting extensions are underway."  The Bank did not disclose in its Form 10-Q, or anywhere else, its continued use of the Waiver Practice (including approximately $32 million in relevant commercial loans waived in the First Quarter of 2010), or that previously none of the past due loans subject to the Waiver Practice had been publicly reported.  (GX 5.)  Similarly, these loans subject to the Waiver Practice were not included in the Bank's First Quarter 2010 Call Report (GX 78), or in any of the Monthly Regulatory Reports submitted to the Federal Reserve during the First Quarter of 2010 (GX 247.).

In an earnings call with investors on or about April 23, 2010, in which Harra, Gibson, North, and other Bank executives participated, North responded to an analyst's question regarding the quality of matured loans that were in the process of being extended by saying that "[t]he profile of these credits aren't necessarily credits with issues or problems," when North, Harra, and Gibson knew that, in fact, many of the matured loans were experiencing problems with declining performance metrics and collateral values.  (GX 103; Tr. 3572-73 (Roberts).)

In an earnings call with investors on July 23, 2010, Gibson fielded a question regarding the Bank's past due loan portfolio, during which he stated that "as a technical matter, a matured loan is past due principal."  Gibson did not disclose that the Bank's longstanding use of the Waiver Practice, including in the Second Quarter of 2010, had concealed from public reporting a material quantity of matured loans that met his own definition of a past due loan.  (GX 104R; Tr. 3573-76 (Roberts); Tr. 5747-49 (Hodgson).)

In or around July 2010, the Bank eliminated the Waiver Practice.  (GX 556; Tr. 1909-1912 (Styles).)  As a result of the Bank's elimination of the Waiver Practice, the amount of reported past due and nonaccrual loans increased significantly.  (GX 108R; GX 110R; Tr. 3557, 3561 (Roberts).)

By the end of the Third Quarter 2010, the Bank's loan portfolio continued to deteriorate. (GX110R; Tr. 4255-4256 (Hart).)  Approximately $158 million in loans waived at year-end 2009, or more than half of all waived loans (52%), were either reported as past due or placed on nonaccrual status at the end of the Third Quarter 2009.  (GX 1030A.)  During the Third Quarter 2010, the Federal Reserve issued the Bank a "troubled condition" letter and remained at the Bank on a daily basis to perform "continuous monitoring."  (Tr. 2458-2460 (Corkery)).)  On November 1, 2010, Wilmington Trust was acquired by M&T Bank.  (Tr. 2467 (Corkery).)

## III.   ANALYSIS OF PROOF

Counts 2 and 4-19 are all premised on alleged false statements made or caused to be made by the defendants in SEC Reports, Call Reports, and monthly past due loan submissions to the Federal Reserve pursuant to the MOU.  Each of these offenses require the government to prove certain elements against each defendant, such as: (1) the existence of a false statement; (2) the defendants' knowledge that the statement was false; (3) the materiality of the false statement; (4) the defendant's willful conduct and/or intent to deceive in making or causing the false statement to be made; and (5) the defendant's knowingly entered an agreement together.  *See* Exhibit A (Chart of Charges and Elements.)  While the government will be prepared to address evidence related to all of the elements charged at the Rule 29 hearing, set forth below is an analysis of the willfulness element and the agreement giving rise to the conspiracy.

### A.   WILLFULNESS

The term "willfully" in the context of the securities statute, 15 U.S.C. § 78ff (Counts Four and Six), does not mean that the defendant need know that his conduct was unlawful, only that it was wrongful.  *See United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004); *United States v. Kaiser*, 609 F.3d 556, 568 (2d Cir. 2010); *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998).  Knowingly making misleading or false statements is a wrongful act.  *See Kaiser*, 609 F.3d

at 569 (noting that defendant had taken a "wrongful act" by making misstatement in corporate books).

With regard to Counts Five and Eleven through Sixteen, "willfully" means that the defendant was aware, at least in a general sense, that his or her conduct was unlawful and that the defendant acted with a purpose to disregard or disobey the law.  To act willfully, however, does not require proof that a defendant knew of the existence and meaning of the particular statute making the conduct criminal, not does it require any proof of an evil motive or bad purpose outside of the purpose to either disregard or disobey the law.  *See United States v. Moyer*, 674 F.3d 192, 214 (3d Cir. 2012); *United States v. Starnes*, 583 F.3d 196, 212-13 (3d Cir. 2009).  As the Third Circuit noted in *Starnes*, proof of willfulness often depends on circumstantial evidence and the reasonable inferences that may be drawn from a defendant's conduct.  "'Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts.'"  *Id.*  (quoting *United States v. Bank of New England*, 821 F.2d 844, 854 (1st Cir. 1987)).

The trial evidence demonstrated that each Defendant knew that the Bank's past due loan figures were materially misleading, or exhibited reckless disregard to that fact.  During trial, the evidence showed that the Bank significantly grew its commercial loan portfolio during the mid-2000's – a fact known to all Defendants. (GX 624; Tr. 3872 (Conway)); 4342-4343 (Terranova).) However, because this expansion was concentrated in Delaware, there were a limited number of "Class A" real estate developers for the Bank to target.  (Tr. 4343 (Terranova).)  As a result, the Bank targeted borrowers who were "less seasoned and financially capable" than before.  (Tr. 4343 (Terranova).

By October 2009, however, the commercial loans originated in the boom years were coming due. During this critical time, the trial evidence demonstrated that Defendants were aware of three critical facts: (1) the volume of matured loans spiked to levels unlike any previous quarter in the Bank's history. (Tr. 3892 (Conway); 1454 (Infanti); GX 53); (2) the economic downturn placed significant pressure on the Bank's commercial loan portfolio – decreasing collateral values, limiting the ability of borrowers to repay (especially the "less seasoned" borrowers described above), and depressing market trends for future sales (Tr. 3891 (Conway)); and (3) third parties, including Bank employees and Federal Reserve Examiners, placed Defendants on notice that not only was the commercial loan portfolio deteriorating, but that the Bank possessed systemic loan administration problems, including the use of supplemental financing that "may be masking the severity of the problem loans in the portfolio and "weak credit underwriting." (Tr. 1451-58, 1507-1513 (Infanti); GX 401; GX 463R; GX 221R). It was, therefore, no longer reasonable for any Defendant to claim the waiver practice or the mass extension of loans at year-end 2009 was a legitimate business practice designed to report a "true" or "accurate" past due number to the public. Indeed, the decision to continue to employ the waiver practice despite knowing that these significantly distressed credits would be difficult (if not impossible) to resolve transformed what was at-a-minimum a bad business practice into a criminal act that Defendants knew concealed the true condition of the Bank's commercial loan portfolio from the public and regulators.

Against this backdrop, North was aware that the Bank reported its past due loan information publicly. He participated in drafting the Credit Risk section of the Bank's SEC Reports, which contained disclosures regarding past due loans. North's awareness of the wrongfulness of the waiver practice is established by numerous emails that he sent questioning the practice. North knew that the that many of the waived credits were experiencing substantial

difficulties given his awareness of declining real estate values and problems uncovered by the Federal Reserve, the Bank's own employees, and the "Surge" process.

Similarly, the trial evidence established that Rakowski knew about the waiver practice and the legal requirement to report all past due loans.  As Controller, she was the Bank employee responsible for compiling the Bank's financial information, including Call Reports and SEC Reports, and she was well-aware of GAAP and regulatory reporting requirements.  Rakowski frequently drafted memos for the Bank's Audit Committee and KPMG in support of Bank accounting decisions, including on topics regarding the Bank's compliance with GAAP and regulatory accounting guidelines.   She was also KPMG's primary contact on Bank accounting matters and a member of the Bank's Disclosure Committee.   Given Rakowski's extensive accounting experience and specific accounting activities at the Bank, the evidence establishes that she knew or deliberately ignored that the Bank had an obligation to report matured loans as past due.  *See United States v. Stadtmauer*, 620 F.3d 238, 258-59 (3d Cir. 2010) (holding that a jury may be given a willful blindness instruction relating to a defendant's knowledge of the facts and knowledge of the law – but not to the additional requirement that the defendant had the specific intent to violate or disregard the law).

Defendant Gibson was the Bank's CFO.  He signed each of the Call Reports submitted by the Bank and in so doing certified that they had been prepared in accordance with the instructions, despite knowing this was not true.  Gibson knew about the waiver practice and its magnitude in October 2009, the state of the economy, the financial struggles of the Bank's borrowers, and the identified weaknesses in the management of the commercial loan portfolio.  Gibson further helmed the capital raise in February 2010, participated in due diligence, helped to draft the Form 10-K, signed the 10-K, and marketed the capital raise to the public.

Defendant Harra was similarly informed.[3]  His unique vantage point was the knowledge of the Bank's borrowers and thus he was directly aware of the issues facing the loan portfolio.  Like Defendant Gibson, he had been informed about the weaknesses in the internal controls over the loan portfolio by both internal and external parties.  Harra also signed each Call Report, certifying it had been prepared in accordance with the instructions, despite knowing that it had not been.  He similarly signed the 10-K – knowing it contained false information.  Like his co-defendants, Harra knew of the waiver practice and its magnitude.  Despite all of the information available to Defendant Harra, he not only persisted in the waiving of matured loans from 90 day past due reporting, he also failed to disclose the practice to outside parties (including during the capital raise) or the public, despite multiple opportunities to do so.

### B.  CONSPIRACY – EVIDENCE OF THE AGREEMENT

The government may prove the elements of a conspiracy "entirely by circumstantial evidence," because agreements to engage in criminal activity are inherently clandestine and direct evidence is often rare.  *United States v. McGlory*, 968 F.2d 309, 321 (3d Cir. 1992).  Accordingly, the government "does not have to prove the existence of a formal or written agreement, or an express oral agreement spelling out the details of the understanding."   Model Criminal Jury Instructions, 3d Circuit, § 6.18.371C.  A conspiracy may be inferred "from evidence of related facts and circumstances from which it appears as a reasonable inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding."  *Id.* at 321-22 (citation and quotation omitted).

---

[3] Despite his counsel's claim that he was "not a numbers guy," Defendant HARRA spent 41 years at the Bank, joining directly after receiving his degree in Accounting from the University of Delaware and rising up to become responsible for all banking activities at Wilmington Trust.  (GX 435.)

The government may likewise utilize circumstantial evidence to demonstrate a defendant's intent to join a conspiracy and further its goals.   Model Criminal Jury Instructions, 3d Circuit, § 6.18.371E.   For example, "evidence that a defendant derived some benefit from the conspiracy or had some stake in the achievement of the conspiracy's objective," may show that that defendant intended to further that objective.  *Id.*   The government "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants."  *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002); Model Criminal Jury Instructions, 3d Circuit, § 6.18.371C  ("The government also does not have to prove that all the members of the conspiracy directly met, or discussed between themselves their unlawful objectives, or agreed to all the details, or agreed to what the means were by which the objectives would be accomplished.").

As charged in the Indictment the objects of the conspiracy include: (1) to defraud the United States; (2) to commit securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (the substantive offense charged in Count 2); or (3) to make false statements to Federal Regulators, including either the SEC or Federal Reserve in violation of 18 U.S.C. §§ 1001 and 2 (the substantive offenses charged in Counts 5 and 11 through 16).   To "defraud the United States" means to obstruct or interfere with one of the United States government's lawful functions by deceit, craft, trickery, or dishonest means."   Here, each of these objects centers upon the concealment of the Waiver Practice from the Federal Reserve, the SEC, and investors, resulting in the concealment of a material number of 90 day past due loans in its Call Reports, Monthly Regulatory Reports to the Federal Reserve, and SEC filings.   Further, the failure to provide this same information to the examiners from the Federal Reserve during the course of bank examinations in 2010, and in monthly submissions required under the MOU, constitutes defrauding the United States.

As to establishing membership in the conspiracy, the United States has shown the Defendants acted in concert on multiple occasions to achieve the unlawful objective of concealing the Bank's true volume of 90 day past due loans.  Examples of the range of coordinated conduct proven at trial is set forth in Exhibit B.  From these acts, a reasonable finder-of-fact could determine that Defendants agreed to achieve the objectives of the conspiracy charged in Count 1.

## IV.    DEFENDANTS' ARGUMENTS

Defendants focus on an alleged lack of proof of the requisite mental states for the charged crimes and the lack of an agreement between the parties sufficient to prove a conspiracy. Defendant Harra argues, for example, that it depends on the finder of fact drawing a set of inferences in his favor and ignoring other evidence presented at trial that militate against his desired outcome.  While he may be free to argue these inferences to the jury, they cannot support a motion for a judgment of acquittal.  Taking his bullet points (D.I. 745 at 2) in turn:

- That Mr. Harra, did not consider a commercial real estate loan as "past due," is, for present purposes, insignificant.  The Bank's internal loan accounting system, the plain terms of the Bank's loan agreements and the relevant regulatory instructions did consider them past due.  The government has introduced evidence demonstrating that Mr. Harra knew a contrary view existed.  Thus, a rational finder of fact could determine that Mr. Harra's personal view of what was a "past due" loan was irrelevant to the actions he undertook and his disregard for contrary views shows the requisite criminal *mens rea*.

- That Wilmington Trust waived matured loans for a long time prior to the charged conspiracy also fails to support Mr. Harra's motion.  In the years prior to 2009 a waiver practice (originally designed to correct processing issues associated with loan participations) was used to remove some loans from past due reporting.  That, however, does not preclude a jury from finding that its use in 2009-2010 to waive hundreds of millions of dollars in past due loans when Defendant Harra knew about the economy and its impact on Wilmington trust's loan portfolio was criminal.

- Internal disclosure of the Waiver Practice does not require a finder of fact to conclude that there was no criminality associated with the failure to accurately report loans as past due in public reporting outside of the company.

- That certain documents alluding to the Waiver Practice were provided to the Federal Reserve and KPMG is also not dispositive.  The characterization of these documents as

"explicitly" describing the practice is inaccurate.  The actual content of, the context in which they arise, and the timing of these purported disclosures do not require any particular conclusion by a finder of fact.

- The argument that neither KPMG or the Federal Reserve complained about the practice is first and foremost dependent on Defendant's argument that that practice was actually disclosed in a meaningful way.  Moreover, the timing of any such disclosure, in essence, after the Bank changed its practice does not alter the underlying illegality of the conduct at the time it took place.  There are, simply differing possible conclusions to draw from the "silence" of KPMG and the Federal Reserve, and the jury should be the body that draws those conclusions.

More generally, the government has set forth evidence of the agreement between and among the Defendants to engage in conduct they knew to be unlawful.  As a signer of both the Call Report and the Bank's SEC filings, Defendant Harra can be fairly charged with the knowledge of those requirements- in particular where the relevant Call Report certification explicitly references the relevant instructions.  In addition, the Bank's own systems and loan documents suggest a definition of past due of which the evidence shows Mr. Harra was (or should have been) aware.  His failure to affirmatively disclose the waiver practice and the related mass extension of loans can also be reasonably interpreted to be indicative of an effort to conceal the information from the Federal Reserve and the public.  The finder of fact can and should make those determinations.  Accordingly, Defendant Harra cannot meet his high burden on a Rule 29 Motion.

Defendant Gibson raises many of the same arguments as Defendant Harra – and for the same reasons those arguments fail.  Here, what matters are the actions and beliefs of the individuals who actually approved the waiver of past due loans (North), and then, with that knowledge of the waiver, oversaw the preparation of the Bank's financial reporting of past due numbers (Rakowski), signed the Call Reports (Gibson and Harra), signed the SEC Filings (Gibson, Harra, and

Rakowski), and spoke to the public about what those numbers meant (North and Gibson).[4]  In

citing to portions of the testimony of Mr. Corkery, Mr. Fomunyam, and Mr. Depman, Defendant

Gibson ignores their most basic assertion – that they were unaware of the waiver practice.  Simply

put, a finder of fact could reasonably draw opposite inferences from the same evidence cited by

Defendants (not to mention the evidence in the record set forth herein that Defendants do not

mention).

However, Defendants Gibson and Rakowski go further than Defendant Harra and seek to

impose on the government not the legal standards as set by Third Circuit law and the Court, but

instead what they wish the standard was.  In arguing that the government failed to prove falsity

(D.I. 746 at 29-32), Defendant Gibson returns to the argument addressed and rejected by the Court

in its Memorandum Order regarding the OTS Q&A (the "Order").  (D.I. 740.)    Defendant

Rakowski raises a similar argument.  (D.I. 744 at 10-13.)  In the Order, the Court determined that

the Call Report instructions were unambiguous and that when principal was not paid at the maturity

date, a loan was "past due" for purposes of reporting.  (D.I. 740 at 4.)  Thus, there is no actual

dispute here that the representations contained in the Call Reports were false.  Accordingly, the

government has certainly met its burden with regard to falsity under a Rule 29 standard.[5]  What

---

[4] As noted above, there is no "glaring gap" as to evidence of Defendant Gibson's awareness of
Schedule RC-N's requirements.  Quarter after quarter, Mr. Gibson signed the Call Reports and
certified that "I, the undersigned CFO (or equivalent) of the named bank, attest that the Reports of
Condition and Income (including the supporting schedules) for this report date have been
**prepared in conformance with the instructions issued by the appropriate Federal regulatory
authority** and are true to the best of my knowledge and belief."  (GX 76, GX 77, GX 78) (emphasis
added).

[5] The Order only addresses the Call Report definition of "past due."  For SEC reporting purposes,
the government relies on the loan's contractual terms – a standard that comports with Industry
Guide 3 and the GAAP requirement that banks disclose their significant accounting policies for
reporting past due loans (that is, whether loans are delinquent based on contractual terms – as
referenced in the Bank's securities filings – or on payment status).  The government has presented
sufficient evidence to show that the contractual terms of the loans at issue required payment of

remains for Defendants to argue is that they acted in "good faith," because they held a reasonable belief that those loans did not have to be reported.  (D.I. 740 at 9-10.)  The validity of this defense is a question of intent that can only be resolved by the jury.  *See United States v. Schoenhut*, 576 F.2d 1010, 1024 (3d Cir. 1978) (in prosecution for misapplication of bank funds, intent to injure or defraud bank "may be inferred from facts and circumstances shown at trial and is basically a question for the jury.").

In light of the Court's ruling that the Call Report instructions are not ambiguous, the government does not have, as Defendants Gibson and Rakowski argue, the affirmative burden of proving that the Defendants' interpretation was unreasonable.  The cases Defendants Gibson and Rakowski cite, *Whiteside, Stacks, Prigmore*, and *Migliaccio*, are inapposite as in each of those cases the relevant regulation or requirement at issue lacked an objective standard.  *See, e.g., United States v. Stacks*, 821 F.3d 1038, 1044 (8th Cir. 2016) (upholding dismissal of case where relevant SBA regulations made no effort to define "current" or "delinquent").  Here, as the Court has found, the Call Report instructions defined the relevant terms in an unambiguous manner.  While in the course of Defendants' case, they may present additional evidence of their purported good faith interpretation, the government need not affirmatively disprove the objective unreasonableness of competing interpretations of Call Report instructions to survive a Rule 29 motion.  And, because as set forth elsewhere in this opposition, the government has presented sufficient evidence that Defendants had the requisite criminal intent, Defendants' motions should fail.

Defendants North and Rakowski also adopt a more generalized attack on the government's proof in support of their requests for a judgment of acquittal.  It is important to note, however, that

---

principal at maturity date and the failure to do so rendered the loan past due for SEC reporting requirements and thus has met its burden on a Rule 29 motion.

Defendant North misstates the relevant legal standard when he states "'[w]here the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal.'" (D.I. 743 at 3.) The language Defendant North quotes does not, as his papers represent, come from the decision of the Third Circuit in *Smith,* 294 F.3d at 477, but instead is language that appears in several district court decisions from a single judge in the Eastern District of Michigan.[6]   Defendant Rakowski also chooses to ignore Third Circuit precedent, opting instead for more favorable language curated from decisions in the Ninth, Second, and Tenth Circuits.  However, the operative Third Circuit standard set forth in *Brodie* remains intact; the court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Brodie*, 403 F.3d at 133.

Contrary to the arguments advanced by Defendants North and Rakowski, when viewed through the appropriate lens on a Rule 29 motion, the government has met its burden of supporting a rational finder of fact's determination that there was an agreement in which each of the Defendants participated. On the substantive false statement counts, the evidence of Defendant North's endorsement and approval of the waiver practice, which is central to the false statements, is sufficient to give rise to liability as an aider and abettor.  As to Defendant Rakowski, the Court should afford no weight to the decisions made by her counsel to engage in only limited questioning of witnesses[7] (D.I. 744 at 7-8) and should focus instead on the evidence against Defendant

---

[6] While citing back to language in the Second Circuit's decision in *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000), Defendant North fails to note that the Second Circuit upheld the conviction based on the "sufficiency of the evidence" and "drawing all inferences in the government's favor." *Id.* at 117.  Outside of the E.D. Michigan opinions, the case has never been cited for the language quoted by Defendant North and is more frequently cited for the proposition that Courts should "assess the evidence in the light most favorable to the government." *Id.* at 116.

[7] While Defendant Rakowski presents this as an unequivocal indication of the dearth of evidence against her, it can also be fairly viewed as motivated, at least in part, by a desire to avoid

Rakowski the government presented at trial: that she was responsible for the Bank's public reporting of financial information, including 90-day past due loan information; that she was aware of the Waiver Practice and its magnitude; that she was aware of the problems with the Bank's loan portfolio; that she certified both as to the validity of and controls over financial reporting; and that she never discussed the practice directly with either the Federal Reserve or KPMG.  While the ultimate burden of proof remains the government's, as to these Rule 29(a) motions, Defendants have not met their own "extremely high" burden.  *Salahuddin*, 765 F.3d at 348.

## CONCLUSION

For all of the reasons set forth above, the United States respectfully requests that the Court deny Defendants' Motions for Judgment of Acquittal.

Respectfully Submitted,

DAVID C. WEISS
United States Attorney

By:             /s/        
Robert F. Kravetz
Lesley F. Wolf
Jamie M. McCall
Assistant United States Attorneys

April 15, 2018

---

implicating her proffer statement – the incriminating nature of which the government disclosed to the Court at sidebar.